# In the United States Court of Federal Claims

No. 20-315C

(Filed Under Seal:  May 28, 2020)

(Reissued:  June 4, 2020)

| | |
|---|---|
| **UTECH PRODUCTS d/b/a/ ENDOSOFT, LLC,**<br><br>Plaintiff,<br><br>**v.**<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>**and**<br><br>**PROVATION MEDICAL, INC.,**<br><br>Defendant-Intervenor. | Post-award protest of a sole source procurement; justification; 41 U.S.C. 3304(a)(1); responsible sources |

Alan Grayson, Alan Grayson, Esq., Windermere, Florida, for plaintiff.

John H. Roberson, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Tyler W. Brown, Attorney, District Contract Law National Practice Group, Department of Veteran Affairs, Washington, D.C.

Alex P. Hontos, Dorsey & Whitney LLP, Minneapolis, Minnesota, for defendant-intervenor.

## OPINION AND ORDER[1]

---

[1]Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review the decision and provide proposed redactions of any confidential or proprietary information.  Neither the government nor defendant-intervenor proposed redactions.  Plaintiff proposed redactions of information regarding the agency's

LETTOW, Senior Judge.

Plaintiff Utech Products d/b/a EndoSoft, LLC ("EndoSoft") protests the actions of the Veterans Health Administration of the Department of Veteran Affairs (the "VA" or the "government") in awarding a sole-source contract for a gastrointestinal electronic medical record software system to defendant-intervenor ProVation Medical, Inc. ("ProVation"). EndoSoft alleges that the VA inappropriately awarded the contract to ProVation without soliciting other offers and evaluating them through a competitive lens, requesting that this court declare that the VA's decision was arbitrary, capricious, an abuse of discretion, and not in accordance with law. As relief, EndoSoft requests that this court enjoin the VA from taking further action on the contract, direct that the contract be terminated for convenience, award attorney's fees and proposal preparation costs to EndoSoft, and grant any other relief the court deems appropriate. *See* Compl. at 21, ECF No. 1.

**FACTS**[2]

The VA Health Administration is divided into twenty-three regions, referred to as Veterans Integrated Service Networks ("VISNs" or "Regions"). Compl. ¶ 8. In September 2016, Region 6, which encompasses Virginia and North Carolina, *see* Compl. ¶ 8, entered into a contract with Four Points Technology ("Four Points"), which by subcontract procured EndoSoft's services for a gastrointestinal electronic medical record ("GI EMR") software system, *see* AR 1-1 to 2; AR 5-49.[3] As many as half of VA's medical centers nationwide use EndoSoft. AR 4-40. Essentially a medical recordkeeping software, GI EMR systems enable physicians to electronically document procedures performed after providing patient care. *See* AR 5-49. The 2016 contract with Four Points served to replace EndoWorks, a GI EMR system produced by Olympus and previously used by Region 6. *See* AR 5-66; AR 5-71. The Four Points contract contained an initial base one-year period of performance and four option years. *See generally* AR 1. The current option year ends on May 31, 2020 and the next option year is scheduled to begin on June 1, 2020. *See* AR 3-38. The VA, however, determined not to exercise

---

evaluation of plaintiff's performance of the service being provided on the contract sought to be replaced by the procurement at issue. That information is not "proprietary information" of plaintiff that should be redacted. *See National Telecommuting Inst. v. United States*, 129 Fed. Cl. 595, 598 n.1 (2015).

[2]The following recitations constitute findings of fact by the court from the administrative record of the procurement filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[3]The government filed the administrative record pursuant to RCFC 52.1(a) on April 1, 2020, ECF No. 24. Subsequently, the government filed supplements to the record that had been inadvertently omitted initially. *See* ECF Nos. 31, 37. The record is divided into nineteen tabs and sequentially paginated. References to the record are cited by tab and page as "AR ___-___."

2

the option, *see* AR 5-49, and the course of events following that decision ultimately led to this litigation.

After implementation of the EndoSoft system under the Four Points contract, several locations within Region 6 began to observe technical glitches in the software. On January 7, 2019, for instance, a nurse manager in Durham, North Carolina noted that a report was apparently deleted as if never entered after the completion of a procedure. *See* AR 5-59 to 60. She also reported that "patients we had checked in were systematically being deleted." AR 5-59. She noted that she had reported the issue to "the software company last time" and "[t]hey told me they fixed the problem, but I don't think it is fixed . . . because it happened again today." AR 5-59. A nurse in Richmond, Virginia replied that there, too, they "[were] experiencing the same problems" and that she had "a nurse assigned to monitor this and other issues on a daily basis." AR 5-59. The following day, VA notified Four Points and EndoSoft that "[t]he end users are still experiencing issues with patients getting deleted after EndoSoft told us recently this issue was resolved" and asked them to shed light on "what went wrong when the first fix was applied and how the next fix will be tested thoroughly for ensuring this problem truly gets resolved this time." AR 5-57 to 58. In reply, EndoSoft acknowledged that "procedures are in fact being cancelled by the interface." AR 5-57 (emphasis removed). After further troubleshooting, EndoSoft identified "a few items that need[ed] to be addressed," including "continued deletion of PT appointments at random" and the addition of physicians, fellows, and other staff to procedure reports at random. AR 5-55. The record does not disclose whether these issues were ever satisfactorily resolved or how broadly they pertained to other medical centers within Region 6, but it does indicate that as late as April 2019 "frustration with the EndoSoft program continue[d] to be the topic of weekly conference calls." AR 5-79. Such technical frustrations led the VA to conclude that the EndoSoft system "does not offer user interface functionalities [needed] to prevent impact on patient care workflow and schedules." AR 5-75.

In December 2018, the chief medical officer of Region 6 authorized the formation of a workgroup to conduct a site visit to the Charleston medical center "to evaluate the ProVation GI EMR in a VA setting for consideration as a potential replacement to the existing EndoSoft GI EMR system." AR 5-75. The group—which consisted of a physician, biomedical engineer, and nurses—conducted a site visit on March 26, 2019 and issued a White Paper ("the White Paper") outlining their conclusions on April 17, 2019. *See* AR 5-75 to 79. Principally divided into two sections, the White Paper first identified "criteria for decision making" categorized into three areas: clinical effectiveness, patient safety, and ease of use. AR 5-76 to 77. It then proceeded to compare the strengths and weaknesses of ProVation with EndoSoft under each of these three categories. AR 5-77 to 79. After identifying multiple strengths of ProVation and weaknesses of EndoSoft, each subsection concluded by noting that the "physicians and nurses that participated in this demonstration did not have any weaknesses to report about Pro[V]ation when compared with EndoSoft." AR 5-77 to 79.

In a market research report dated June 20, 2019, contracting officer Cole Culley concluded that Region 6 "requires a replacement [GI EMR] [s]ystem to replace the current system, EndoSoft," because it had "proven to be insufficient," listing eight specific areas in

which EndoSoft had purportedly failed to meet the needs of Region 6.  AR 19-1253.[4]  The report then noted that searching by the keyword "GI EMR" in a database containing vendor information, 179 different potential vendors were identified, but it "determined that the required solution is only available from the large business manufacturer ProVation."  AR 19-1253.  That conclusion stemmed from the report's findings about the transferability of data from the original EndoWorks system.  *See* AR 19-1253.  Because third parties are legally restricted from accessing the EndoWorks records database, Olympus (the original equipment manufacturer for EndoWorks) developed and authorized an export tool to enable data migration from its system.  AR 19-1253 to 1254.  The market research report observed that "[t]he EndoWorks [e]xport [t]ool is the only authorized tool which accurately extracts data from EndoWorks into standardized files, so that the data can be correctly imported into the [p]referred [v]endor's systems, retaining data integrity."  AR 19-1253.  Mr. Culley determined, however, that Olympus had authorized only two so-called "preferred vendors" to use its data export tool: ProVation and gMed.  *See* AR 19-1253 to 1254.  This conclusion about the limited number of vendors with exclusive rights to the EndoWorks tool appears to have come solely from statements indicating such found on the Olympus website.  *See* Hr'g Tr. 72:21 to 73:3 (May 14, 2020).[5]  Building on that finding, Mr. Culley's report eliminated gMed as a viable option for Region 6 because it "is more geared toward the clinic setting," leaving ProVation as "the only vendor that meets the requirements of this request."  AR 19-1254.  Nothing in the report, however, indicated how EndoSoft, then being used throughout Region 6, had transferred the EndoWorks data when initially implemented as part of the Four Points contract or whether ProVation possessed the capability to migrate data recorded in EndoSoft since that time.  The market report concluded by recommending that the VA "sole source this requirement to" ProVation, observing that "[t]he use of another GI EMR

---

[4]The eight deficiencies were:

   (1) Physicians are not capable of generating accurate colonoscopy reports in EndoSoft;
   (2) EndoSoft must be accessed through Citrix to chart or view reports which ca[u]ses a lag that delays patient care;
   (3) EndoSoft associated printers frequently drop-off of Citrix, which creates additional delays;
   (4) Reports in EndoSoft cannot be edited;
   (5) Physicians cannot search reports performed by GI Fellow Attending separately in EndoSoft;
   (6) EndoSoft offers minimal patient information within the system and contains many errors with regards to spelling;
   (7) EndoSoft reports take over ten minutes to transcribe and often contain spelling errors; and
   (8) [P]rocedure times in EndoSoft are inaccurate and must be manually inputted by the physician.

AR 19-1253.

   [5]Subsequent citations to the transcript of the hearing held on May 14, 2020 will omit the date.

system outside of ProVation will require the VA to purchase an entirely new line of endoscopes," resulting in millions of dollars of additional costs and staff retraining "[t]hat would cause a substantial delay in patient care." AR 19-1254 to 1255.

Shortly thereafter, Mr. Culley underwent several surgical procedures that placed him on sick leave until August 12, 2019, and his supervisor, Keeshia Newman, assumed responsibility for emergency matters relating to his work assignments in the interim. *See* Def.'s Cross-Mot. for Judgment on the Admin. R. and Mot. to Dismiss ("Def.'s Cross-Mot."), App. A at 2, ECF No. 39. On July 23, 2019, Ms. Newman completed a justification and approval for other than full and open competition ("J&A") identifying ProVation as the only source meeting the necessary requirements. *See* AR 5-65 to 69. The J&A—which relied heavily on the findings of Mr. Culley's market research report, quoting it verbatim in places—identified the same eight inadequacies with EndoSoft, *see* AR 5-66, and concluded that, under FAR § 6.302-1, no other source could satisfy the agency's requirements because "Olympus has given access to its proprietary conversion software to only two companies . . . . [and t]here is no[thing] the government can do to overcome this barrier," AR 5-68.

On August 8, 2019, the VA posted on the federal business opportunities website—"for information purposes only," AR 5-64—a notice of its intent to sole-source the contract, *see* AR 5-49; AR 5-61 to 64. The posting listed a series of five requirements, including "capab[ility] of migrating all data through the use of the EndoWorks [e]xport [t]ool," and stated that because the needed services are "highly specialized" and "only available from a single source," the VA "intends to award the contract with an effective date of September 1, 2019 to Pro[V]ation Medical." AR 5-62. The next day, EndoSoft sent an email to Ms. Newman in "strong protest" of the sole source notice. AR 16-1241. The email emphasized that the "[r]equirement to migrate data from EndoWorks legacy system has already been completed by EndoSoft" at all Region 6 sites and thus "does not require the use of the tool provided by Olympus." AR 16-1241. Asserting that "[t]his is not a unique requirement," EndoSoft contended that it "has a proprietary migration tool that was utilized to migrate the data" from EndoWorks and other legacy systems in the previous two years and that it had employed that tool at 41 different VA medical centers, including 11 medical centers within Region 6. AR 16-1241 to 1242. Countering the conclusion that continuing with EndoSoft would require purchasing an entirely new line of scopes, the email noted that "EndoSoft is vendor[-]neutral and is compatible with Olympus Endoscopes and is also being currently used at all of [Region] 6 sites." AR 16-1242.

A few days later, EndoSoft followed up on its email to inquire "regarding the acceptance of the protest and confirmation of our filing." AR 16-1240. Ms. Newman promptly responded, stating that she "wasn't aware that the email you sent was an 'official protest[.]' I understand your concerns and we will be withdrawing the intent notice and proceeding with full and open competition." AR 16-1240. She then clarified that "[w]hen a solicitation is issued it will have clear specifications of what the government is seeking." AR 16-1239. But, on August 22, 2019, Ms. Newman replied again, *see* AR 18-1248, attaching a short statement of facts, which concluded that she had considered EndoSoft's protest and "determined that it is in the government[']s best interest to proceed with the sole source to Pro[V]ation," AR 17-1246. She noted that "FAR Subpart 13.5 Simplified Acquisitions Procedures for Certain Commercial Items procedure[] was used for this acquisition, which vests the contracting officer with additional

procedural discretion and flexibility that maximizes efficiency, economy, and minimizes burden and administrative costs for both the [g]overnment and industry." AR 17-1246.

On August 22, 2019—the same day that Ms. Newman notified EndoSoft that its protest had been rejected—Mr. Culley, who by this time had returned from sick leave, executed a second J&A "in order to provide additional justification that was not previously included in the [first J&A]." AR 5-50. The second J&A stated that the procurement was "in accordance with FAR 13.5 Simplified Procedures for Certain Commercial Items and specifically FAR [§] 13.501 Special Documentation Requirements, where acquisitions conducted under Simplified Acquisition Procedures are exempt from the requirements of FAR Part 6, but still require a justification using the format of FAR [§] 6.303-2." AR 5-70. Like the first J&A, the second J&A pointed for its statutory authority to FAR § 6.302-1, which permits other than full and open competition when there is only one responsible source and no other supplies or services can satisfy agency requirements. AR 5-71.

The J&A again enumerated the same eight EndoSoft inadequacies, concluding that "failure of the EndoSoft system to assure information accuracy results in errors which places the safety of our veterans at an unneces[]ary and entirely avoidable risk." AR 5-72. It also noted that ProVation offered a unique benefit because private sector academic medical affiliates at Duke University and Virginia Commonwealth University also use ProVation. *See* AR 5-71. Were Region 6 to implement ProVation, the J&A reasoned, it "will further facilitate more efficient care of [v]eterans since gastroenterology fellows and surgical residents rotating through the VA gastroenterology section are likely to have already been trained on ProVation MD at the academic affiliate." AR 5-72. Implementing ProVation could thus prevent "inefficiencies both in terms of training and ongoing clinical care" as well as "risk of incomplete or inaccurate documentation in the medical record" caused by gastroenterology fellows and university physicians who "are often unfamiliar with [EndoSoft]." AR 5-71. Finally, the J&A again iterated that any GI EMR system Region 6 obtained must have "the capability of transferring data through the use of the EndoWorks [e]xport [t]ool" and only ProVation, because of its nearly exclusive authorization by Olympus, could do so. AR 5-72.

EndoSoft filed a protest with the Government Accountability Office ("GAO") on August 23, 2019. *See generally* AR 4. The VA filed a response defending its decision on September 23, 2019, *see generally* AR 5, and ProVation submitted its response on October 3, 2019, *see generally* AR 6. Without addressing the merits, "because the protester failed to file its comments on the agency report by the due date," GAO dismissed the protest on October 4, 2019. AR 7-86. GAO thereafter denied EndoSoft's request for reconsideration on October 18, 2019. *See generally* AR 9. The VA awarded the contract to ProVation on January 24, 2020, *see* AR 13-114, and EndoSoft filed a post-award GAO protest on January 31, 2020, *see generally* AR 10, which GAO again denied on February 28, 2020 without addressing the merits, *see generally* AR 13.

EndoSoft filed its complaint in this court on March 20, 2020. *See generally* Compl., ECF No. 1. The court granted ProVation's motion to intervene on March 24, 2020. *See* Order granting Mot. to Intervene, ECF No. 15. Following submission of the administrative record on April 1, 2020, EndoSoft filed a motion for judgment on the administrative record on April 7,

2020.  *See* Mot. for Judgment on the Admin. R. ("Pl.'s Mot."), ECF No. 25.  The government
and ProVation each filed a cross-motion for judgment on the administrative record and a motion
to dismiss on April 21, 2020.  *See* Def.'s Cross-Mot.; Def.-Intervenor's Cross-Mot. for Judgment
on the Admin. R. and Mot. to Dismiss ("ProVation's Cross-Mot."), ECF No. 38.  After further
briefing by the parties, *see* Pl.'s Reply to Def.'s Cross-Mot. and ProVation's Cross-Mot. ("Pl.'s
Reply"), ECF No. 40; Def.'s Reply to Pl.'s Resp. ("Def.'s Reply"), ECF No. 42; Def.-
Intervenor's Reply to Pl.'s Resp. ("ProVation's Reply"), the court held a hearing on May 14,
2020.

      After the parties had completed briefing the dispositive motions, a development relating
to Olympus's licensing of the EndoWorks export tool to preferred vendors came to light.  On
May 13, 2020, the government filed a notice of newly-discovered information inconsistent with
certain of its prior factual statements.  *See* Notice of New Information, ECF No. 48.  The
government, commendably, disclosed that a closer perusal of the Olympus website indicated
that, in addition to ProVation and gMed, a third company, Cerner Corporation ("Cerner") also
possesses rights to the EndoWorks extract tool for data migration, contrary to the evidently
mistaken factual premise of the agency throughout the procurement process.  *Id.* at 2-3.

## STANDARDS FOR DECISION

      The Tucker Act vests this court with jurisdiction "to render judgment on an action by an
interested party objecting to a . . . proposed contract or to a proposed award or the award of a
contract or any alleged violation of statute or regulation in connection with a procurement or a
proposed procurement."  28 U.S.C. § 1491(b)(1).  Standards set forth in the Administrative
Procedure Act ("APA"), codified in relevant part at 5 U.S.C. § 706, govern the court's review of
a protest of a government contract award.  *See* 28 U.S.C. 1491(b)(4) ("In any action under this
subsection, the courts shall review the agency's decision pursuant to the standards set forth in
section 706 of title 5.").  Under 5 U.S.C. § 706(2)(A), the court may set aside an agency's
procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law."  The court's determination is subject to the traditional balancing test
applicable to a grant of equitable relief.  *See PGBA, LLC v. United States*, 389 F.3d 1219, 1224-
28 (Fed. Cir. 2004); *Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014).

      The court shall not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed.
Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (in turn
quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated
on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))).  The court
may overturn the government's procurement decision only "if '(1) the procurement official's
decision lacked a rational basis; or (2) the procurement procedure involved a violation of
regulation or procedure.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir.
2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324,
1332 (Fed. Cir. 2001)).  Protests alleging a violation of regulation or procedure "must show a
clear and prejudicial violation."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d at 1374, 1381
(Fed. Cir. 2009) (quoting *Impresa Construzioni*, 238 F.3d at 1333).

Designed in part "to bring the benefits of competition to government procurement," *ATA Def. Indus., Inc. v. United States*, 38 Fed. Cl. 489, 498 (1997), the Competition in Contracting Act of 1984 ("CICA"), Pub. L. No. 98-369, Div. B, Tit. VII, 98 Stat. 1175 (codified, as amended, in various sections of titles 10, 31, and 41 of the United States Code) establishes a general rule that federal agencies must "obtain full and open competition through the use of competitive procedures," 41 U.S.C. § 3301(a)(1). That presumption is strong but not absolute; the statute expressly allows for exceptions, permitting the use of noncompetitive procedures in specifically enumerated contexts. One such exception applies when "the property or services needed by the executive agency are available from only one responsible source and no other type of property or services will satisfy the needs of the executive agency." 41 U.S.C. § 3304(a)(1). The regulations implementing these provisions explain that the exception may be appropriate "[w]hen there is a reasonable basis to conclude that the agency's minimum needs can only be satisfied by[] [u]nique supplies or services available from only one source or only one supplier with unique capabilities." 48 C.F.R. § 6.302-1(b)(1)(i). To properly invoke this exception, the statute requires the contracting officer to execute, and obtain approval of, a written justification that includes certain elements specified in the statute. *See* 41 U.S.C. § 3304(e)(1)-(2). At issue here is whether the agency adequately justified its invocation of the exception.

To restate the pertinent legal criteria, agencies may procure their needs from sole sources, "us[ing] procedures other than competitive procedures only when . . . the property or services needed by the executive agency are available from only one responsible source and no other type of property or services will satisfy the needs of the executive agency." 41 U.S.C. § 3304(a)(1); *see also* 48 C.F.R. § 6.302-1(a)(2) ("When the supplies or services required by the agency are available from only one responsible source . . . and no other type of supplies or services will satisfy agency requirements, full and open competition need not be provided for."). "Identical review standards apply under the APA in the context of a sole-source award." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) (citing *Myers Investigative and Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 605) (2000)) (additional citation omitted). "When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award." *Id.* (citation omitted). It can show prejudice in two ways, either by showing: "(1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award; or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award." *Id.* (citations omitted).

## ANALYSIS

This dispute hinges on whether the VA's decision to disregard the requirements of competitive procurement by making a sole-source award to ProVation "involved a violation of a statute, regulation, or procedure." *Emery Worldwide*, 264 F.3d at 1086. The court finds that it did.

8

The government and ProVation proffer several reasons to support their contention that ProVation was and is the only source capable of satisfying the agency's minimum needs. They assert that the VA's comparison of EndoSoft's and ProVation's merits throughout this process did not constitute "engaging in the evaluation of technical superiority that happens during competitive procurements" but rather sought to explain why EndoSoft "could not be an alternative source for [the VA's] specific requirement." ProVation's Cross-Mot. at 14 (citations omitted) (emphasis removed). "The agency was not conducting a relative weighing of proposals," ProVation emphasizes, "it was articulating why EndoSoft was not a viable alternative source." *Id.* at 15 (citations omitted). The evidence throughout the record, however, belies that conclusion, indicating that the animating force driving the VA's decision to seek a new GI EMR system was a preference for ProVation over EndoSoft. To begin, the White Paper consisted almost entirely of a comparison of the strengths and weaknesses of the two systems. *See* AR 5-77 to 79. Likewise, EndoSoft's "insufficient" performance in VA's Region 6 served as the premise of the market research report, and the eight performance-focused shortcomings that the report identified found their way into both subsequent justification-and-approval reports. *See* AR 19-1253; AR 5-66; AR 5-71 to 72.

The determination that a new contractor could perform better the same functions an incumbent contractor currently performs is insufficient, even if true, to justify a sole-source award. *See Aero Corp. v. Department of the Navy*, 540 F. Supp. 180, 208 (D.D.C. 1982) (Oberdorfer, J.) ("[T]he technical and administrative superiority of a given firm over all other possible sources has never been accepted as a justification for sole-source procurement from that firm."). Even assuming the incumbent contractor's performance fails to perfectly satisfy the agency's expectations, that circumstance alone would not justify circumventing the competitive process and awarding the contract without soliciting bids. Thus, in this context, EndoSoft's purported poor performance did not and could not justify abandoning standard competitive procedures when seeking a replacement.

The agency's justification for its decision also relied heavily on its determination that only ProVation had authorization to use the Olympus data export tool, a capability the agency considers a requirement. *See* AR 5-62; AR 5-72 to 73. But this position is problematic. First, the agency takes as a given that data migration is impossible without access to the EndoWorks export tool, and it labels the tool a minimum need only ProVation could satisfy because of that assumption. But, undermining the agency's reasoning, EndoSoft, apparently without access to the tool, had already imported the historical EndoWorks data. That EndoSoft had successfully done so belies the agency's basic premise that data migration could not be done without the tool. Likewise, given that EndoSoft already stores the historical data, the agency offers no convincing explanation why a potential replacement would even require compatibility with the legacy EndoWorks system; it would seem that capability to export data from EndoSoft would achieve the same objective. In response, the government posits that EndoSoft's import of patient data from EndoWorks was, in fact, the problem rendering EndoSoft insufficient in the first place. *See* Def.'s Reply at 3-4 (noting that "the VA has experienced the inadequacy in EndoSoft's importation . . . of patient data from EndoWorks, to the degree that the EndoWorks data w[ere] actually imported into EndoSoft's GI EMR system."). Nothing in the record, however, supports this contention. While the record is relatively sparse about the specific complaints users had with EndoSoft, the particular complaints which are included have no apparent relation to

9

historical data imported from the legacy EndoWorks system; instead, the documented complaints relate to ongoing new inputs to the EndoSoft system. *See, e.g.*, AR 5-59 (documenting a user complaining about the deletion of a report of a procedure that had been entered that same day).

Second, while asserting that the export tool for migrating historical data from EndoWorks is a minimum need, the agency simply disregards that ProVation's system is incompatible with that of EndoSoft, meaning that ProVation has no means to import any of the existing data input into the EndoSoft system over the past several years. *See* Hr'g Tr. 42:21 to 43:19. The agency concedes that using ProVation will thus produce a gap in patient records but contends that it can manually input that data from EndoSoft into ProVation. *See id.* In sum, the agency cannot persuasively explain why it must have a special tool to import data from before the implementation of EndoSoft, yet it does not require such a vehicle to import the more recent data accumulated in EndoSoft since that time.

Third, even assuming the data cannot be migrated without the EndoWorks export tool, that justification is not without serious shortcomings. As a preliminary matter, nothing in the record shows how difficult it is to obtain licensure from Olympus. The agency prevented every other potential GI EMR provider from competing for the contract because it determined, apparently relying solely on an internet search, *see* Hr'g Tr. 72:21 to 73:3, that only one supplier possessed a specific license, but it has provided no evidence suggesting that other providers could not obtain that authorization to compete under ordinary competitive procedures. More significantly, another entity has already obtained such rights, undermining the major premise of the agency's decision to forego competitive procedures. Counsel for the government laudably disclosed after briefing that closer examination of the Olympus website revealed that a third company, Cerner, also possessed authorization to use the export tool. *See* Notice of New Information at 3. The supposed exclusivity of ProVation's access to the export tool served as a factual premise woven throughout the agency's justification for abandoning standard competitive procedures.

At the hearing on the merits, the government suggested that Cerner might not be relevant because it might not be a potential provider of a GI EMR system. *See* Hr'g Tr. 34:10-21. Subsequently, the contracting officer sought further information from Cerner about its capabilities to export EndoWorks data using the export tool. *See* Declaration of Cole Culley, ECF No. 53. In response to Mr. Culley's queries, Cerner informed him that it "does have the ability to u[se] the EndoWorks [e]xport [t]ool for data migration," but, because Cerner does not offer its own GI EMR system, its "solution must be leveraged . . . and is not deployable on its own." *Id.* at 3 (quotation omitted). On this basis, the contracting officer concluded that "while Cerner does have access to the EndoWorks [e]xport [t]ool, they do not offer a standalone GI EMR system and therefore would not have been a prospective offeror had [a] solicitation . . .

been comp[l]eted." *Id.*[6] Mr. Culley's additional information, however, does not eliminate Cerner—under the agency's own stated criteria—as a potential alternative source. The agency's stated minimum need was access to the export tool, not access to the tool *and* status as a standalone GI EMR provider. Anyone with access to the tool could meet the stated minimum need so long as they could leverage the tool with an adequate GI EMR system. For example, the contract that resulted in Region 6 implementing EndoSoft in the first place employed a subcontractor mechanism—the VA contracted with Four Points, not EndoSoft, to obtain the EndoSoft GI EMR system. Likewise, Cerner need not offer its own GI EMR system to meet the agency's stated minimum needs and still qualify as a prospective offeror in a competitive process.

That Cerner likewise possesses the same or similar authorization as ProVation exposes a flaw in the agency's position, indicating that the already questionable basis for the sole-source award—that ProVation was the only responsible source capable of satisfying a minimum need—was in fact unfounded. In sum, if both Cerner and ProVation possess similar access to the export tool, then at least one other potentially responsible source can satisfy the agency's stated minimum need, and therefore, without something more, the sole-source award to ProVation cannot be justified under the one responsible source exception permitted by Paragraph 3304(a)(1).

Finally, the government and ProVation contend that ProVation's system offers a "unique qualification[]" in that it could "foster an overall facility level of integration which is presently non-existent between the VISN facilities and [the VA's] healthcare partners in the private sector." Def.'s Cross-Mot. at 14 (citation and quotation omitted). They emphasize that because the VA's academic affiliates (namely, Duke University and Virginia Commonwealth University) utilize ProVation's system for their endoscopy units, "[i]f the VA were to acquire a different software system, it would introduce inefficiencies both in terms of training and ongoing clinical care" due to the regular rotation of medical personnel between the VA and its academic affiliates. *Id.* (citation and quotation omitted); *see also* ProVation's Reply at 9-10 (noting that within Region 6 "at least one [medical center] has 14 gastroenterology fellows and 16 attendings rotating between the academic affiliate and the VA[,] and another has 2 nurses, 2 techs, and 5 physicians who rotate"). But this justification is also unavailing. First, EndoSoft convincingly draws into question the agency's rationale by observing that it made no attempt to explain "why it would be preferable to retrain every [VA] medical professional in [Region] 6 on a new system, rather than cross-training visiting staff on the existing EndoSoft system." Pl.'s Reply at 8-9 (emphasis omitted). Furthermore, the court recognizes that mutual system interface familiarity for rotating medical professionals may very well be a desirable feature to increase efficiency, but a preference for efficiency is not the same as a minimum need, and as such is not enough to justify departing from standard competitive procedures. *See McAfee, Inc. v. United States*, 111

---

[6]Cerner evidently is well-known to the VA. At the hearing, counsel for the government advised the court that "Cerner was given a large $10 billion contract from the VA in May of 2018 to replace the VA's legacy electronic health records system." Hr'g Tr. 34:13-15; *see also* Pl.'s Resp. to Decl. of Contracting Officer Cole J. Culley at 4, ECF No. 56 ("Cerner [is] in the midst of implementing the VA's $16 billion Electronic Health Record Modernization Program . . . nationwide.").

Fed. Cl. 696, 711-12 (2013) (holding that an agency's goals of standardization and sole-source procurement were not proper justifications for a non-competitive award); *Savantage Fin. Servs., Inc. v. United States*, 81 Fed. Cl. 300, 308 (2008) (noting that an agency "cannot merely select certain software systems because it feels they are most cost-effective" because "so long as there is more than one source competent to perform the contract, [the agency] must evaluate the merit of each offeror's product through the competitive lens").

## CONCLUSION

For the reasons stated, the court finds the VA's decision to forego the requirements of competitive procurement by making a sole-source award to ProVation to be unwarranted. Consequently, EndoSoft's motion for judgment on the administrative record is GRANTED IN PART, and the government's and ProVation's cross-motions for judgment on the administrative record and to dismiss are DENIED.[7]  The court ENJOINS the VA from implementing the ProVation contract and orders that it be set aside.  The clerk is directed to enter judgment accordingly.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

---

[7]Additionally, EndoSoft's pending motions to supplement the administrative record, *see* ECF Nos. 26, 41, are DENIED, and EndoSoft's motion for preliminary injunction, *see* ECF No. 9, is DENIED as moot.